IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JOHN HICKMAN,

        Plaintiff,

v.                                                                                      Civil Action No. 3:11-cv-00788

WALTER KUCHARSKI,
*Auditor of Public Accounts*

        Defendant.

## MEMORANDUM OPINION

The plaintiff, John Hickman, formerly worked as an employee of the Virginia Auditor of Public Accounts (APA). He has sued the APA alleging racial discrimination that took various forms—termination of his employment, disparate discipline, and failure to promote—in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Virginia Human Rights Act (VHRA), Va. Code Ann. § 2.2-3900 *et seq.* In addition, he attempts to raise state claims of "wrongful discharge in violation of public policy" and negligent disclosure of information about him. Both parties have moved for summary judgment under Federal Rule of Civil Procedure 56.

The Court will grant the defendant's motion. The record establishes that Hickman simply did not perform well. He, therefore, cannot prevail under Title VII because he cannot state a prima facie case, and cannot rebut the legitimate nondiscriminatory reasons for the agency's actions. Further, his VHRA action fails as a matter of law because the APA is not covered by the statute, and because sovereign immunity bars his claim. Similarly, sovereign immunity also bars his negligence claim.

## I. Statement of Facts

Both parties have filed motions for summary judgment. The following facts are taken from the parties' various pleadings and accompanying exhibits.

Hickman worked as an Information Systems Security Specialty Auditor at the APA. During his 3 ½-year tenure with the APA beginning on July 31, 2006, Hickman was the lone African-American on the six-person Information Systems Security Specialty Audit team, of which Goran Gustavsson was the Director. Hickman performed audits for state agencies and institutions of higher education. Like all APA employees, he received a yearly written performance review listing expectations and employee performance measures for the members of his team.

Hickman's 2009 comprehensive review, completed in March of that year, reflected adequate overall performance for someone in his position[1] but nevertheless cited several specific concerns. Gustavsson "noticed some inconsistencies" in Hickman's work papers from the previous year such as conclusions unsupported by test work. He urged Hickman to correct this shortcoming as quickly as possible. Gustavsson wrote that "[t]ypically, unsupported conclusions are evidence of the auditor either not understanding the audit step, or trying to take short-cuts. Neither approach is acceptable under the auditing standards." Gustavsson had previously pointed out Hickman's problems in substantiating conclusions. He went on to describe concrete steps that the plaintiff could take to address these shortcomings. He also cited other areas where Hickman needed to demonstrate improvement, such as sampling size determination, sampling

---

[1] The plaintiff points out that a March, 2009 review shows that he met the "minimum" requirements for all of an auditor's duties, despite the "constructive feedback" he also received in the same performance review. This establishes, at best, that there were no grounds for immediate termination in March, 2009. It says nothing about whether his performance should be seen as adequate from the standpoint of future reviews.

2

documentation, participation during staff meetings, and ability to evaluate an audit "environment" and draw appropriate conclusions. Thus, the review made it clear that the plaintiff needed to raise his performance level in multiple ways.

Hickman's semi-annual review, on October 21, 2009, again pointed out his professional shortcomings. Gustavsson "continue[d] to see inconsistencies in [Hickman's] work papers, unsupported conclusions, and inconsistently executed audit test work steps." In one particular audit, Hickman had tested and written conclusions about the wrong subject. Moreover, because his conclusions continued to be inadequately supported, Hickman not only caused clients inconvenience but also increased his own hours by having to go back to seek out additional support.

Gustavsson told Hickman that he now fell below "the auditor judgment skills expected of an auditor with over three years' experience." Rather than determining "the impact of the information security program as a whole . . . on the financial or performance audit," Hickman was employing a "'check-list' approach." This approach showed a lack of "consideration of the complete environment." Hickman also was unproductive while "teleworking," failed to inform the Director of anticipated absences until specifically asked, and showed inconsistencies that suggested either "cutting corners" or misunderstanding of the audit programs. In the end, Gustavsson said that Hickman seemingly did not comprehend "audit risk," which "is one of the most fundamental understandings an auditor needs to have." The plaintiff acknowledged receipt of the evaluation but wrote next to his signature, "I don't agree with the assessment." He did not, however, submit anything in writing to explain his perspective.

The APA placed Hickman on probation, effective that same day, October 21, 2009. The probation was originally scheduled to continue through January 22, 2010, with additional evaluations during the period of probation.

Hickman received an interim review on December 7, 2009, approximately 45 days after the October 21 review. Gustavsson found that the plaintiff had "not improved the skills required of [him] as an auditor." Gustavsson specifically discussed the following problems: a lack of understanding of basic sampling techniques; submission of incorrectly filled out timesheets; lack of communication; and continually inconsistent documentation of work, which showed a failure to follow directions and led to the time spent on an assignment being grossly overstated. Gustavsson discussed specific examples of errors, and concluded that Hickman did not have a basic grasp of the skills required of an auditor. Gustavsson concluded that Hickman had "not made satisfactory improvement" during probation, and that his lack of comprehension of "audit risk" was not sufficient for a fourth-year auditor.

On January 21, 2010, Gustavsson again told Hickman that he had failed to meet expectations. He summarized the findings from the 45-day evaluation and also addressed another specific instance of Hickman's failure to follow directions. As a consequence, the APA extended the probationary period for an additional 60 days. During this period, Hickman would work on various audits under the supervision of Joseph H. Stepp or Karen K. Helderman, "each with expertise in information systems auditing." Hickman would, again, receive at least one interim assessment and a final evaluation on March 24, 2010, the final day of the probationary period. At that point, the APA would either end the probation or terminate his employment immediately—no further extension of probation was foreseeable.

On February 4, 2010, Roland N. Turner, the APA's Director of Human Resources, and Martha S. Mavredes, Deputy Auditor of Public Accounts, met with Hickman to remind him of the APA's expectations for all staff and to review the office's policies and procedures manual. Several days earlier, Hickman had told them that he wanted to file a grievance against Gustavsson. During the meeting he shared, among other things, his concern that he was being watched more closely than others on his team and wanted his managers' practices to be applied evenly. Turner agreed that if Hickman wrote something explaining his grievances and giving his side of the story, that document could be included in his personnel file. By the end of the meeting, Hickman indicated that he wanted to go home and think about whether he wanted to file a grievance.

On February 9, 2010, Turner, Mavredes, and Hickman met again to determine whether Hickman still intended to file a grievance, planned to write a letter for his personnel file, and wanted Stepp and Helderman to continue to serve as his supervisors, given Hickman's previously expressed concern that they were friends with Gustavsson. Ultimately Hickman did not file a grievance, did not provide anything giving his side of the story for his personnel file, and did not object to these new managers.

On March 15, 2010, Stepp completed a thorough review of Hickman's audit of a program at George Mason University. Stepp found that Hickman "did not meet accepted professional standards for documentation, conclusions based on completed test work, or work completed within the time allotted." The review listed numerous concrete criticisms of a similar nature to the deficiencies earlier brought to Hickman's attention.

In closing, Stepp wrote, "Five weeks of work on George Mason University and once again we did not seem to add much value to the audit or the university. . . . Your work does not

meet the standards required of government auditors and you do not demonstrate your work as improving from one assignment to the next." At the bottom of the review, it says that Hickman refused to acknowledge his receipt by signature. It is also indicates that Karen Helderman was present at the March 16 meeting where these issues were discussed.

On March 16, 2010, Turner and Mavredes informed Hickman that his employment would end effective March 24, 2010, "due to unacceptable work performance commensurate with your experience."

## II. Standard of Review

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255.

Summary judgment must be granted if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the non-moving party "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, the mere existence of a scintilla of evidence, or the appearance of some

metaphysical doubt concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (internal quotation marks and citations omitted).

While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the non-moving party cannot prevail as a matter of law. *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897 (1987).

### III. Discussion

#### A. Title VII Discrimination Claim

Where, as here, a plaintiff lacks direct evidence of discrimination in violation of Title VII, the Court follows a three-step framework for analyzing his claim of employment discrimination. Under the Supreme Court's *McDonnell Douglas* test, the employee must first set forth a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff is successful, the employer then has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If this occurs, the presumption of unlawful discrimination created by the plaintiff's prima facie case "drops out of the picture," and the burden shifts back to the employee to show that the legitimate reason was actually just pretext for discrimination. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (relying on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Hickman's claim cannot proceed past the first stage of this analysis, because he failed to meet the requirements for a prima facie case. In the alternative, the plaintiff has not created a disputed factual issue concerning the legitimacy of the reasons for his firing.

*i. Discriminatory Discharge*

To establish a prima facie case of discriminatory discharge, the plaintiff must establish the four following elements, each by a preponderance of the evidence: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that, at that time of the firing, he was performing at a level that met the employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class. *See King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003); *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222 (4th Cir. 1998); *Scales v. USF Logistics*, No. 3:04CV448, 2004 WL 3488637, at *3 n.4 (E.D. Va. Dec. 3, 2004).

Although Hickman can satisfy the first two elements, his evidence does not meet the last two prongs of the test. The plaintiff's evaluations and performance reviews demonstrate that he fell far below the standard of a public auditor.

The plaintiff attempts to show that he performed satisfactorily by relying on "satisfactory feedback" he received about a single job in December, 2009. That he did one job right simply does not undermine the voluminous criticism of his supervisors. This single "feedback" does not show that Hickman performed adequately in general, nor does it contradict the many specific problems cited by his supervisors.

Even assuming for the sake of argument that Hickman could make out a prima facie case of disparate disciplinary practices, he would still have to show that his *termination* was wrongful in some way or another. *See Scales*, 2004 WL 3488637, at *4 ("However, even if this Court were to conclude that Plaintiff met his initial burden, which it cannot, Defendants have articulated a legitimate non-discriminatory reason for firing Plaintiff."). But, as discussed above, the evidence shows that Hickman lost his job because he did not perform at the level required of

a fourth-year auditor with the APA, and Hickman does not offer more than a "scintilla" of evidence to the contrary.

Hickman repeatedly insists that the reasons offered for his termination were pretextual and that the real reason was his race. *See, e.g.,* Pl.'s Mem. Supp. Summ. J. 5. The proof, he appears to argue, is that the defendant has "not provided any evidence of gross misconduct or substantial incompetence on behalf of plaintiff." *Id.* The law does not require either "gross misconduct or substantial incompetence" to justify a termination. Employers may legitimately demand that employees do their jobs well.[2]

### ii. Disparate Discipline

To bolster his Title VII claim, Hickman also alleges disparate treatment in discipline. In order to demonstrate a prima facie case of disparate discipline, a claimant must show: (1) he or she is a member of a protected class; (2) the prohibited conduct in which he or she engaged was as serious as the misconduct of employees outside the protected class; and (3) the employer imposed harsher disciplinary measures against him or her than against employees outside the protected class. *See Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).

The plaintiff claims that Gustavsson gave more favorable treatment to two white employees. According to the plaintiff, one of the white employees allegedly arrived late to work each day and the other did not meet the standards for someone with over one year of experience, but neither was ever disciplined or terminated. *See* Pl.'s Mem. Supp. Summ. J. 2. The first

---

[2] Hickman points out that the Virginia Employment Commission found that he was not disqualified for unemployment benefits. The VEC's decision to grant Hickman unemployment benefits has no bearing on the Title VII standard for employment discrimination. The VEC applies a liberal standard for awarding unemployment benefits. Employees are presumed qualified, unless the employer can show a "willful disregard" of the employer's legitimate demands. In other words, unintentional incompetence does not disqualify an employee from unemployment benefits. It may, however, serve as a legitimate non-discriminatory reason for termination.

employee, however, was transferred to a different specialty team in January 2009, and the other white employee only worked part-time solely for the duration of his graduate school program. *See* Def.'s Mem. Opp. Pl.'s Mem. Supp. Summ. J. 5. In other words, one was no longer on the same team when Hickman was placed on probation, and the other was not even a full-time employee. As a result, Hickman cannot show that these other employees were "similar in all relevant respects," which is necessary for a discrimination claim based on disparate treatment. *See Heyward v. Monroe*, 166 F.3d 332, 1998 WL 841494, at *2 (4th Cir. 1998) (internal citations omitted) (addressing plaintiff's need to provide evidence that the employees dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it). Hickman, therefore, cannot make out a prima facie case of disparate disciplinary practices.

### iii. Failure to Promote

Hickman also claims that the APA failed to promote him because of his race. Given that the agency fired him because of his poor work performance, his failure to promote claim obviously has no basis.

### B. State Law Claims

### i. Virginia Human Rights Act and Wrongful Discharge

The plaintiff's employment discrimination claim under VHRA fails as a matter of law because the APA is not an employer with "more than five but less than 15 persons" on its staff. Va. Code Ann. § 2.2-2639(B). VHRA creates a limited private right of action against racial discrimination against employers with fewer than 15 employees.[3] The Court will take judicial

---

[3] The VHRA fills the gap created by Title VII, which only applies to "employers" with "fifteen or more employees." 42 U.S.C. § 2000e(a)-(b).

notice that APA has far more than fifteen employees[4] and therefore does not fall within the ambit of VHRA. *See Wells v. BAE Systems Norfolk Ship Repair*, 483 F. Supp. 2d 497, 512 (E.D. Va. 2007) (holding the VHRA does not create an independent cause of action against an employer that has fifteen or more employees).

The plaintiff's claim that he was wrongfully discharged in violation of public policy also fails as a matter of law. The Commonwealth of Virginia has eliminated any potential common law claims for employment discrimination that refer to the policies cited in VHRA but do not have explicit statutory approval. *See Doss v. Jamco, Inc.*, 254 Va. 362, 371-72 (1997) (holding that VHRA's 1995 amendment prohibited a common law cause of action based upon the public policies in the statute); *see also Conner v. Nat'l Pest Control Ass'n, Inc.*, 257 Va. 286, 290–91 (1999) (Hassell, J., concurring). Since the plaintiff's claim is not expressly permitted by any other statute, it simply fails as a matter of law. *See, e.g., McCarthy v. Texas Instruments, Inc.*, 999 F. Supp. 823, 829–30 (E.D. Va. 1998).

### ii. Negligence for Violation of Confidentiality

Finally, Hickman complains that, after his termination, the "APA and its staff would invade [his] privacy by improperly disclosing the reason for [his] adverse action and not protect the confidentiality of [his] employee records." Pl.'s Mem. Supp. Summ. J. 4. Hickman offers no legal authority to support this claim of negligence. Even if some common law tort existed for negligent disclosure of employment information, the APA would be protected from such a claim by the doctrine of sovereign immunity. *The Rector and Visitors of UVA v. Carter*, 267 Va. 242, 244, 591 S.E.2d 76 (2004). As a result, the Court will grant summary judgment to the defendant on this claim as well.

---

[4] *See* Auditor of Public Accounts 2011 Annual Report at 25, http://www.apa.virginia.gov/reports/APAAnnualReport11.pdf (last visited March 6, 2012).

## IV. Conclusion

For the reasons set forth above, the Court shall grant the defendant's motion for summary judgment with respect to all claims. The plaintiff's motion for summary judgment shall be denied.

The Court shall enter an appropriate order.

                                                         /s/
                                 John A. Gibney, Jr.
                                 United States District Judge

Date: May 29, 2012
Richmond, VA